IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BELFOR USA GROUP, INC.,

                              Plaintiff,                    OPINION AND ORDER

        v.                                                     13-cv-614-wmc

CHICAGO'S BEST, LLC, RANDALL
GRIMES, JUDY GRIMES, and
DUPACO COMMUNITY CREDIT
UNION, INC.,

                              Defendants.

---

In this lawsuit, plaintiff Belfor USA Group, Inc. seeks reimbursement for services it performed on a fire-damaged restaurant owned by two members, Randall and Judy Grimes (who are together referred to here as "the Grimes") and run by Chicago's Best, LLC, as well as from the Grimes' mortgage lender, Dupaco Community Credit Union, Inc. Belfor has since filed separate motions for summary judgment or partial summary judgment against each of the defendants. Dupaco has also cross-moved for summary judgment on Belfor's claims against it. Those motions have been fully briefed, and oral argument was held by telephone on January 14, 2015.

For the reasons that follow, the court will deny Belfor's motions for summary judgment and grant Dupaco's motion for summary judgment in part, reserving on Belfor's claim of unjust enrichment against Dupaco premised on a "double recovery" theory and Belfor's marshaling of assets claim contingent on a finding of the Grimes' personal liability at trial.[1] This case will advance to a bifurcated jury trial, addressing first

---

[1] There is also a motion to strike late-filed affidavits submitted by Dupaco in reply to its motion for summary judgment (dkt. # 116), which will be granted both because they (1)

Belfor's breach of contract claim against defendants Chicago's Best and the Grimes, and then unjust enrichment claims against any of those defendants not found liable for the breach of contract.  Outside of the jury's presence, the court will also take up plaintiff's unjust enrichment claim against Dupaco, in which plaintiff seeks to step into Dupaco's shoes to enforce the mortgage on the fire-damaged property.  Finally, the court will address as a matter of equity Belfor's claim for marshaling of assets against Dupaco depending upon the jury's determination of the Grimes' personal liability.

UNDISPUTED FACTS[2]

**A.  The Parties**

Plaintiff Belfor USA Group, Inc., is a Colorado corporation with its principal place of business in Birmingham, Michigan.  Belfor provides demolition, repair and restoration services after large-scale disasters such as fires and floods.

Defendant Chicago's Best, LLC, was in the business of operating a restaurant. Chicago's Best's sole members are spouses and co-defendants, Randall and Judy Grimes.

---

were untimely and (2) fail to support any of Dupaco's proposed findings of fact or responses to Belfor's proposed findings.

[2] There are multiple gaps in the parties' submitted proposed findings of fact and responses, including defendants' failure to submit their own proposed findings of fact in opposition to plaintiff's motion for summary judgment and plaintiff's decision not to file a reply and its own proposed findings purported to be disputed by some or all of the defendants.  Coupled with plaintiff's numerous, duplicative motions for summary judgment, these gaps complicated the court's task in summarizing the factual record, although much of this was clarified by counsel during oral argument.  Unless otherwise noted, the court finds the following facts material and undisputed based on the parties' written submissions and concessions during oral argument.

2

Defendant Dupaco Community Credit Union, Inc., is an Iowa corporation with its principal place of business located in Dubuque.

Dupaco is a financial lending institution that has provided Chicago's Best and the Grimes personal and commercial loans.  Among them, Dupaco holds a mortgage loan on a property owned by Randall Grimes individually, which contains a restaurant previously operated by Chicago's Best, and apartments, all at 95 N. 2nd Street, Platteville, Wisconsin (the "Property").[3]  The Grimes leased out the nine residential apartments, in addition to renting the restaurant space to Chicago's Best.[4]

### B.  Insurance Coverage

For the relevant time period, the Grimes held building and personal property coverage on the Property from Auto-Owners Insurance Company, for the named insured "RANDY GRIMES DBA CHICAGOS BEST."   (Affidavit of A. John Arenz ("Arenz Aff."), Ex. 3 (dkt. #92-3) p.4.)   The insurance policy identifies Dupaco as the "Loss Payee," which Dupaco represents means that payment of actual cash value upon destruction of the building goes to Dupaco.  (*Id.*, p.10; *see also* Dupaco's PFOFs (dkt. #101) ¶ 19.)

The insurance policy also provides coverage of $25,000 for debris removal and $25,000 for pollutant clean up and removal.  The policy also states that Auto-Owners

---

[3] For reasons not fully explained by the parties, but presumably because of its size, the Property's address is sometimes also listed at 75 N. 2nd Street in certain places in the record.

[4] By virtue of Wisconsin marital property law, there appears to be no dispute that the Property is actually held jointly by both defendants Randall and Judy Grimes. Wis. Stat. § 766.31.

would cover up to 25% of "[t]he amount we pay for the direct loss of or damage to Covered Property." (9/4/14 Affidavit of Eric Linden ("9/4/14 Linen Aff."), Ex. N (dkt. #100-15) p.6.) Finally, the policy covers new construction of up to $1 million under certain circumstances. (Arenz Aff., Ex. 3 (dkt. #92-3) p.5.)

### C. The Fire

On August 25, 2012, a fire largely destroyed the restaurant located on the Property. The roof was a complete loss, as were much of the building's contents. Chicago's Best owned some of the equipment that was damaged in the fire, with Randall Grimes owning the balance. Belfor contends that it is storing that equipment, while Dupaco characterizes Belfor as holding it "hostage, refusing to allow Dupaco to liquidate it." (Dupaco's Resp. to Pl.'s PFOFs (dkt. #147) ¶ 42.)

### D. Dupaco's Interest in Properties Owned by the Grimes

At the time of the fire, Dupaco held a mortgage on and a perfected security interest in the following properties:

- The Property -- mortgage dated February 14, 2007, and recorded with the Grant County Wisconsin Register of Deeds on March 1, as amended by an extension of real estate mortgage dated March 19, 2008, and recorded March 27;

- Real Estate located at 570 West Main Street, Dickeyville, WI 53808 -- mortgage dated March 10, 2008, and recorded on March 19;

- Real Estate located at 70 N. Oak Street, Platteville, WI 53818 -- mortgage dated February 14, 2007, and filed of record on March 1, as amended by the extension of real estate mortgage dated March 19, 2008, and filed April 3; and

- All collateral defined in the commercial security agreement between Chicago's Best, LLC, as grantor and Dupaco as lender, dated February 14, 2007 -- registered by UCC Financing Statement filed with the Wisconsin Department of Financial Institutions on March 6, 2007, and continued on March 5, 2012.

(Dupaco's PFOFs (dkt. #91) ¶ 5.)

At the time Dupaco filed its motion for summary judgment, the 70 N. Oak Street real estate had been sold with the net proceeds applied against the Grimes' loan from Dupaco. Dupaco still maintains a mortgage on the Grimes' residential homestead located at 750 W. Main Street, Dickeyville, Wisconsin, and has cross-collateralized interests on other of the Grimes' holdings.

### E.  Belfor's Work Authorizations

Within two days of the fire, Auto-Owners' adjuster, Steve Schieler, hired Belfor to write an estimate on the cost to repair the restaurant building, which Auto-Owners could use to determine replacement cost value and to ascertain whether any of the restaurant equipment was salvageable. Schieler also put Belfor in touch with Randall Grimes to gain access to the building and remove any salvageable restaurant equipment.

Just two days later, on August 29, 2012, Belfor already had two "work authorizations" for property restoration on the Property. (7/30/14 Affidavit of Eric A.

Linden ("7/30/14 Linden Aff."), Ex. 1 (dkt. #74-1).)   The authorizations were for "contents" and "emergency services."   The work authorizations identify Chicago's Best as the "undersigned (insured)," and are signed by Judy Grimes and Randall Grimes as the "insured-owner-authorized representative."   (*Id.*)   The authorizations also identify "Auto-Owners" as the insurance company.

These documents generally authorize and direct Belfor to "provide all labor, equipment and materials required to properly repair the specific real property, contents or structure" of 95 N. 2nd St., Platteville, WI 53818.   The work authorizations further state that:

> The undersigned hereby transfers, assigns and conveys to Contractor his/her/their right, title and interest in and to the insurance policy proceeds and all drafts for work performed or to be performed by Contractor.   Accordingly, the undersigned authorizes and directs their insurer (named below) to make Belfor USA sole payee on all insurance drafts for all insurance work performed by Contractor on the above damaged property.   The undersigned also agrees to immediately endorse and tender all drafts as produced by the Contractor.

(*Id.* at pp.2, 3.)

The documents also state that "[a]ll insurance work performed by the Contractor is subject to the terms of the insured policy of insurance which sets the scope and price of the work based upon industry standards."   (*Id.*)   Finally, the work authorizations state in smaller print, below the signature lines:

> If for any reason your claim is denied by your insurance carrier or they refuse to pay the costs of any and/or all insurance work performed by Contractor, or you otherwise delay or prevent the payment of said insurance draft, or use it for other purposes, then the insured/owner(s) of the above

> mentioned property will be personally liable for any cost of
> services performed.

(*Id.*)

Defendants dispute that the work authorizations were "enforceable contracts" because neither "include what work was to be included in the designation 'contents,' by when the work was to be completed or the amount it would cost for the services." (Defs.' Resp. to Pl.'s PFOFs (dkt. #44) ¶ 10; citing Affidavit of Randall Grimes ("Randall Grimes Aff.") (dkt. #46) ¶ 9.) The court addresses this dispute below. The Grimes also contend that Belfor's representative, Brian Balthazor, read the Auto-Owners policy at the scene of the fire and informed the Grimes that they "have the right coverage," and that Belfor was "going to be paid by Auto-Owners." (Dupaco's Resp. to Pl.'s PFOFs (dkt. #147) ¶ 8 (citing Deposition of Judy Grimes (dkt. #140) 85-86).)

Belfor represents that it performed emergency demolition services in the amount of $469,461.93 on the property and submits an invoice reflecting this amount. (10/17/14 Affidavit of Eric A. Linden ("10/17/14 Linden Aff."), Ex. H (dkt. #130-8).)[5] These services included rebuilding the roof of the building and drying out the restaurant. Chicago's Best and the Grimes contend that this amount is "unreasonable" and includes "services not requested and the services said to have been performed are in amounts far beyond the value of the remaining shell building site." (Defs.' Resp. to Pl.'s PFOFs (dkt. #44) ¶ 11.)

---

[5] The amount of $376,345.81 reflects services performed directly by Belfor, while the remaining $93,116.12 reflects services provided by subcontractors, including Delta Engineering's services drafting building plans for a planned reconstruction. (Pl.'s PFOFs (dkt. #129) ¶ 19.)

### F.  Insurance Proceeds

On October 2, 2012, Auto-Owners authorized payment of the all cash value ("ACV") proceeds under the policy for destruction of the building at the Property.  On October 5, Chicago's Best insurer Auto-Owners issued a check payable to the order of "Randy Grimes, d/b/a Chicago's Best and Dupaco Community Credit Union and Judy Grimes" in the amount of $418,400.00.  (7/30/14 Linden Aff., Ex. 4 (dkt. #74-4).)  At the request of Dupaco, Randall Grimes endorsed the ACV check to Dupaco, and those funds were applied to Dupaco's outstanding loan on the fire-damaged property.

In addition, Auto-Owners issued a check to "Randy Grimes d/b/a Chicago's Best and Judy Grimes," dated November 16, 2012, for damage to contents in the amount of $174,316.47.  (*Id.*, Ex. 5 (dkt. #74-5).)[6]  The Grimes endorsed this check and deposited it in a lawyer's trust account, where the funds still reside.  Dupaco contends that it holds a secured interest in these funds as well, presumably based on cross-collateralization agreements with the Grimes and the commercial security agreement with Chicago's Best.

Finally, the Grimes received additional insurance proceeds of $289,554.00, which they applied to various personal debts, including taxes on an unrelated commercial building and on their house, obligations to employees and tenants, attorney's fees, living expenses, and amounts owed to business vendors.

---

[6] During the hearing, Belfor represented that it had a right to approximately $40,000 of those proceeds but failed to explain the basis for this claim.

### G. Auto-Owners and Belfor's Negotiations

Throughout the fall of 2012, and culminating in 2013, Auto-Owners adjuster Steve Schieler, with the help of a report by "general adjusters" Randy Christensen and Lindsay Cunningham, negotiated with Belfor and agreed to pay $303,075.26 for Belfor's services.  On January 11, 2013, Schieler sent an email to the home office requesting that it grant authority to issue a check in that amount -- the so-called "agreed figure" -- to the insured and Belfor.  (Arenz Aff., Ex. 2 (dkt. #92-2) p.2.)  In fact, however, Belfor neither received the $303,075.26 check from Auto-Owners, nor did it ever pursue a claim against Auto-Owners for that amount.[7]

Until recently, Belfor had not asked Auto-Owners to issue payment for expenses incurred by the insured above the actual cash value, nor for payment of insurance proceeds from other specific coverages available, such as debris removal and pollutant clean-up and removal.  In Belfor's recently-filed, *amended* motion for summary judgment against defendants Chicago's Best and the Grimes, Belfor acknowledges recently receiving $67,107.96 from Auto-Owners for debris removal covered by its insurance policy.  (Pl.'s Am. Mot. for Summ. J. (dkt. #153) 1.)

### H. Belfor's Diligence and Dupaco's Knowledge of Belfor's Services

Belfor waited four months after beginning work on the Property before obtaining a copy of the Auto-Owners Insurance policy.   For approximately nine months, Belfor

---

[7] Schieler testified at his deposition that he was mistaken about his authority to negotiate this payment for Auto-Owners and about his understanding that the home office would authorize the payment.  Belfor contends that it has no contract with Auto-Owners to sue upon.

neither notified Auto-Owners of work performed, nor provided copies of the work authorizations, nor informed Auto-Owners that Belfor claimed a right to any insurance proceeds. Similarly, for approximately nine months after the fire, Belfor never provided copies of the work authorizations to Dupaco, nor did it inform Dupaco of the existence of those authorizations or otherwise inform Dupaco that Belfor claimed a right to any of the insurance proceeds. Belfor also did not file a mechanics lien on the property.

Instead, Belfor waited until April 12, 2013, to request a creditor search on Randall Grimes, which revealed Dupaco as the mortgagee on the property. Belfor also waited until April 11, 2013, to request a creditor search on Chicago's Best, which similarly showed Dupaco as a secured party.

On June 27, 2013, Andrew Katrichis, Vice President of Business Lending at Dupaco, sent an email to Pat Southers of Belfor seeking information, including the current invoice for Belfor's services, plans/specifications for the building, and a copy of a proposed budget for the reconstruction. (Pl.'s Reply Br. (dkt. #96-1) p.2.) On July 24, 2013, Belfor's legal department sent a letter to Dupaco requesting the "release of insurance proceeds legally assigned and owing to BELFOR USA Group for insurance approved and adjusted property repairs." (*Id.* at p.3.)

### I.  Interim Settlement Agreement

Shortly after this litigation commenced, Belfor, Chicago's Best, Judy Grimes Randall Grimes and Dupaco entered into an "Interim Settlement Agreement," dated November 11, 2013. In exchange for release of Belfor's design plans, and apparently

10

forbearance on pursuing the litigation pending negotiations with the involved parties (including Dupaco and Auto-Owners), over a final settlement that would include rebuilding and reopening the restaurant, Chicago's Best, Judy Grimes and Randall Grimes acknowledged, agreed and admitted that Belfor was owed the "Belfor Unpaid Balance," identified as $425,658.43.  (7/30/14 Linden Aff., Ex. 3 (dkt. #74-3) §§ I.E, IV.)  This amount represents that total amount Belfor had invoiced for work at the Property, minus the unpaid balance owed to Delta Engineering of $43,803.50, which Chicago's Best and the Grimes also acknowledged was owed, and interest on the unpaid amount at the rate of 1.6% per month, along with Belfor's attorney's fees and costs in enforcing its rights under the work authorizations.  (*Id.*; *id.*, Ex. 1 (dkt. #74-1) pp.2-3.)


OPINION

In its First Amended Complaint, plaintiff Belfor asserts a veritable smorgasbord of possible contract, quasi-contract and equitable claims against defendants:  (1) breach of contract against Chicago's Best and the Grimes; (2) unjust enrichment / quantum meruit against all defendants; (3) tortious interference with contract against Dupaco; (4) conversion against all defendants; (5) enforcement of equitable lien against all defendants; (6) equitable lien by agreement / constructive trust against all defendants; (7) equitable subrogation against Chicago's Best and the Grimes; (8) equitable subordination against Dupaco; and (9) marshaling assets against Dupaco.  Plaintiffs have since filed *five*

motions for summary judgment, and Dupaco responded with its own. Some of the motions address a discrete claim or set of claims; others run the gamut across all claims.[8]

For ease of discussion, the court has organized the claims into four categories. The first category concerns all claims against Chicago's Best and the Grimes for failing to pay for Belfor's services (breach of contract, and unjust enrichment/quantum meruit). The second category concerns Chicago's Best and the Grimes' endorsement and Dupaco's cashing and applying of the $418,400 ACV insurance proceeds to the Grimes' mortgage (conversion; tortious interference with a contract; all equitable lien claims; equitable subordination; and equitable subrogation). The third category concerns equitable claims asserted against Dupaco based on its receipt of both insurance proceeds for a destroyed property and the benefit of an improved property due to Belfor's services (unjust enrichment / quantum meruit). Finally, the fourth category concerns Belfor's claim for marshaling of assets against Dupaco.

## I. Claims against Chicago's Best and the Grimes for Failing to Pay for Belfor's Services

Belfor asserts a breach of contract claim or, in the alternative, an unjust enrichment and/or quantum meruit claim against Chicago's Best and the Grimes based on those defendants' failure to pay for Belfor's services.

---

[8] The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Plaintiff is a citizen of Colorado and Michigan; defendants Chicago's Best, LLC, Randall Grimes and Judy Grimes are citizens of Wisconsin; and defendant Dupaco Community Credit Union, Inc. is a citizen of Iowa. (1st Am. Compl. (dkt. #6) ¶¶ 1-5.) The amount in controversy exceeds $75,000. (*Id.* at ¶¶ 6, 16.)

### A. Contract Claims

As for the breach of contract claim, Belfor bases its motion for summary judgment principally on asserted admissions of liability *and* the amount of that liability made in the November 2013 interim settlement agreement.[9]   In opposition to plaintiff's motion for summary judgment, defendants contend that the interim settlement agreement is inadmissible under Federal Rule of Evidence 408.[10]   Certainly, the plain language of the rule is broad, excluding evidence

> either to prove or disprove the validity or amount of a disputed claim or to impeach by a proper inconsistent statement or a contradiction:
>
> (1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or a statement made during compromise negotiations about the claim . . . .

Fed. R. Evid. 408.

Despite this broad language, however, exclusion of proof of the agreement at issue here does not appear to further the purpose of the rule, which is to encourage settlement discussions.  *See generally* 2 Jack B. Weinstein *et al.*, Weinstein's Federal Evidence §

---

[9] During oral argument, Belfor's counsel also pointed the court to certain of the Grimes' responses to the amended complaint and in depositions.

[10] Defendants also rely on Wisconsin's counterpart, Wis. Stat. § 904.08, in support of their argument, though this court relies on federal rules to determine evidentiary issues. *See Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007) ("As a federal court sitting in diversity, we apply Wisconsin state law to resolve substantive questions and federal law to resolve evidentiary issues."); *see also Farnham v. Walmart Stores East, L.P.*, No. 1:13–CV–305–JDL, 2014 WL 6908907, at *3 (D. Me. Dec. 8, 2014) (viewing FRE 408 as a procedural rule and applying it instead of Maine's rule in determining objections).

408.02[1] (2d ed. 2014).  As the Seventh Circuit has cautioned, "[i]n deciding whether Rule 408 should be applied to exclude evidence, courts must consider the spirit and purpose of the rule and decide whether the need for the settlement evidence outweighs the potentially chilling effect on future settlement negotiations."  *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005).

Regardless, there are certain exceptions to the rule, one of which Belfor principally relies on in responding to defendants' argument:  a settlement agreement is admissible if the claim asserted is breach of the agreement itself.  (*See* Pl.'s Reply (dkt. #151) 5.)  *See also Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 691 (7th Cir. 1985) ("Obviously a settlement agreement is admissible to prove the parties' undertakings in the agreement, should it be argued that a party broke the agreement.").  Here, while the interim settlement agreement is apparently being offered by plaintiff to help establish a breach of contract for services and the damages owed under that contract, plaintiff essentially seeks to enforce what it characterizes as a stipulated acknowledgement by Chicago's Best and the Grimes of liability and the amount owed in exchange for the release of renovation designs and at least some forbearance as set forth in the interim agreement.

Of course, plaintiff has not formally pled a claim for breach of contract of the interim settlement agreement.  Instead, the breach of the contract claim asserted in the First Amended Complaint is that Chicago's Best and the Grimes failed to pay for Belfor's services as contemplated by the work authorizations.

The court is nevertheless sympathetic to plaintiff's predicament.  After all, Belfor could not have asserted a claim to enforce the interim settlement agreement until

14

defendants breached its terms, something defendants only did in response to Belfor's motion for summary judgment by failing to honor their recitals in the agreement that there *was* a contract for services between Belfor and defendants Chicago's Best and the Grimes and that Belfor performed services in the amount of $425,658.43. Based on this, the court will allow Belfor to amend its complaint to proceed on a claim seeking to enforce the terms of the settlement agreement.

There is, however, a more fundamental problem with Belfor's reliance on the interim settlement agreement to prove *liability* by Chicago's Best, and even more by the Grimes, for the specified amount. After all, the defendants only formally "acknowledge, agree and admit that Belfor is owed the Belfor Unpaid Balance." (7/30/14 Linden Aff., Ex. 3 (dkt. #74-3) § IV.) This is, at best, a dubious admission of liability, as opposed to an agreement not to dispute the amount of work done. Defendants attempt to draw a distinction between acknowledging that Belfor is owed an amount of money for its services and acknowledging that *Chicago's Best and/or the Grimes* owe Belfor that amount of money. Indeed, the Grimes now argue, not implausibly, given all the circumstances surrounding their execution, that it was their understanding in signing the authorization that *Auto-Owners* is the only party bound by those authorizations. The court finds this claim a stretch given the language of the authorizations themselves, particularly the fine print (assuming the trier of fact finds they are bound by it). However, there is no integration clause, and as discussed below, there is substantial ambiguity in the writing itself and factual disputes about the circumstances and intent of those authorizations.

15

Plaintiff has raised enough ambiguity and factual disputes as to the intent and purpose of the work authorizations to allow a jury to decide if there was a binding contract with respect to the Grimes and Chicago's Best.[11]  First, as to Chicago's Best, the court was initially inclined to find that it was bound by the work authorizations, but now agrees that there are factual disputes which warrant a jury determination.  Most notably, Chicago's Best is identified in the authorization as "the insured," but as is reflected in the undisputed record, the Property was owned and insured by Randy Grimes personally.  Indeed, Randall Grimes was expressly named as the insured in the Auto-Owners policy, albeit as "dba Chicago's Best."  As such, identifying Chicago's Best as the insured and owner of the property in the work authorizations is, at least on its face, inaccurate.  Perhaps this was a mutual mistake, perhaps it was only Belfor's, but a jury will have to assess the parties' intent.

For similar reasons, the court finds disputed facts as to whether the Grimes signed the contract personally.  Presumably, the Grimes signed the authorizations knowing that they, not Chicago's Best, were both owners and insureds of the subject property.  Moreover, the Grimes stood by while this work was performed.  Finally, the Grimes' admission in the pleadings and in depositions may be construed as acknowledgement of their involvement personally.  Certainly, the Grimes can assert their understanding that neither they, nor Chicago's Best, were committing to pay for work they understood was

---

[11] Chicago's Best also opposes plaintiff's motion for summary judgment on the contract by asserting that plaintiff breached the terms of the work authorizations by failing to properly perform the work, and further challenge the amount due.  However, both assertions are precluded by the interim settlement agreement for reasons already addressed above.

being commissioned and paid for by Auto-Owners – indeed, the fact that Belfor drafted the contract with a focus (in the main text) of securing insurance proceeds and burying the "personally liable" provision in tiny font bolsters their claim -- but ultimately, it is for the trier of fact to decide what was or was not agreed and by whom.

Defendants also argue that even as to Chicago's Best, the work authorizations are not enforceable because essential terms are vague or indefinite.  (Defs.' Opp'n (dkt. #144) 3.)  *See also Vohs v. Donovan*, 2009 WI App 181, ¶ 8, 322 Wis. 2d 721, 777 N.W.2d 915 ("A contract is not enforceable if an essential term is indefinite.").  Defendants point to three problems: (1) the work authorizations provide no timetable for the completion of the work; (2) the price is stated as "TBD by estimate"; and (3) the description of the work to be completed by Belfor -- "all labor, equipment and materials required to properly repair the specific real property, contents or structure" -- is too vague.  (*Id.*)   However, none of these arguable ambiguities render the contract unenforceable.  First, the lack of a completion date does not pose a problem.  "The general rule is that where there is an absence of a provision as to the time for performance, a reasonable time is implied."  *Flores v. Raz*, 2002 WI App 27, ¶ 11, 250 Wis. 2d 306, 640 N.W.2d 159.  Second, in light of the extent of the damage and the time at which the contract was signed, the lack of pricing information does not render the contract so indefinite as to be unenforceable, though it does raise an issue for the trier of fact as to whether there was a meeting of the minds as to what Belfor could invoice.  Third, the contract describes all of the services Belfor committed to providing.  While covering a broad range, this provision is also not indefinite or vague.

Accordingly, the court will deny Belfor's motion for summary judgment on its breach of contract claim against Chicago's Best and the Grimes, allowing that claim to proceed to trial. At the same time, the court does agree that *if* bound by the work authorizations to pay for Belfor's authorized services, then Chicago's Best and the Grimes are contractually bound by the interim settlement agreement to pay $469,461.93 for those services, less any insurance reimbursement. For example, if, as claimed by the Grimes, Auto-Owners is the only party bound, then Belfor has no contract claim against any of the defendants. Similarly, if only Chicago's Best contracted with Belfor to perform services, then the Grimes only acknowledge Chicago's Best's indebtedness -- and not their own personally -- in the interim settlement agreement. Finally, if the jury finds Chicago's Best *and* the Grimes are bound by the work authorizations, then those defendants acknowledged that all three are on the hook for the unpaid amount in the interim settlement agreement.[12] In the event that the jury does *not* find all three defendants liable for breach of contract, the jury will consider an unjust enrichment claim against those defendants not found liable, as described below.

---

[12] While the court has relied on the interim settlement agreement to enforce its terms, the court sees no basis for presenting this evidence to the jury, since the its sole role will be to decide whether and which defendants breached the terms of the work authorizations.

### B.  Unjust Enrichment

Plaintiff also asserts a claim of unjust enrichment and/or quantum meruit against defendants Chicago's Best and the Grimes.[13]   To state such a claim, plaintiff must demonstrate:   (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value.  *Puttkammer v. Minth*, 83 Wis. 2d 686, 688-89, 266 N.W.2d 361, 363 (1978).  While plaintiff has put forth sufficient evidence to demonstrate defendants' awareness of Belfor's endeavors, fact issues remain as to whether Belfor conferred some benefit upon Chicago's Best and the Grimes by providing emergency services relating to the property and kitchen equipment, and, relatedly, whether it would be inequitable for defendant to retain that benefit without payment.[14]

The court raised the issue during the hearing as to whether a trial on an unjust enrichment claim is for a jury or for the court.  The court looks to federal law to make

[13] It appears plaintiff uses unjust enrichment and quantum meruit interchangeably, from which the court infers that plaintiff is pursuing a contract implied in fact claim.  *See* 2 Michael B. Apfeld *et al.*, Contract Law in Wisconsin Ch. 14, § III.C.3.b (4th ed. 2013).

[14] Even if there is a sufficient basis to conclude that plaintiff conferred some benefit -- counsel for the Grimes and Chicago's Best conceded at oral argument that Belfor's services "preserved" the property -- a jury will have to determine the appropriate remedy, and therefore, the court finds it prudent to have a jury determine liability as well. Moreover, if the jury finds that all three defendants breached a contract with Belfor, then the unjust enrichment claim will be moot.  *Cont'l Cas. Co. v. Wis. Patients Comp. Fund*, 164 Wis. 2d 110, 118, 473 N.W.2d 584, 587 (Ct. App. 1991) ("The doctrine of unjust enrichment does not apply where the parties have entered into a contract.") (citing *Watts v. Watts*, 137 Wis. 2d 506, 530, 405 N.W.2d 303, 313 (1987)).

19

this determination, *Simler v. Connor*, 372 U.S. 221, 222 (1963), and the determination ultimately rests on whether the remedy sought is legal or equitable in nature, *Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990).  The court understands plaintiff to be seeking an order of restitution to compensate plaintiff for the services it provided to Chicago's Best and the Grimes.  Because this form of restitution is a legal remedy, *see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002), a jury trial is warranted on that claim.

Of course, this raises a question as to what is the appropriate measure of damages for an unjust enrichment claim.  Belfor argues that the *best* evidence is the amount invoiced, but this is not the sole measure.  *See Ramsey v. Ellis*, 168 Wis. 2d 779, 484 N.W.2d 331 (1992) (describing different measures of restitution for claims based on contracts implied in fact as compared with claims based on contracts implied in law).  The parties should be prepared to address this issue in their proposed jury instructions on damages for the unjust enrichment claim and/or at the final pretrial conference.

## II. Claims Concerning Belfor's Right to the $418,400 AVC Insurance Proceeds

Belfor seeks summary judgment on a number of its claims against Dupaco and the equitable subrogation claim against Chicago's Best and the Grimes, all of which rest on the underlying theory that it had a superior right to the $418,400 ACV insurance payment endorsed by Randall Grimes to Dupaco and applied by Dupaco to its

outstanding mortgage loan on the property.[15]   Taking the claims in turn, plaintiff's conversion claim requires a showing that Dupaco wrongfully exercised control over the insurance proceeds.  *H.A. Friend & Co. v. Prof'l Stationary, Inc.*, 2006 WI App 141, ¶ 11, 294 Wis. 2d 754, 720 N.W.2d 96 (describing elements of conversion as "(1) intentional control or taking of property belonging to another; (2) without the owner's consent; (3) resulting in serious interference with the rights of the owner to possess the property"). Likewise, Belfor concedes that imposition of a constructive trust and equitable lien both require a showing of "unjust enrichment *plus some wrongdoing* by the benefitted party (in this case, Dupaco)."  (Pl.'s Br. (dkt. #128) 23 (emphasis added).)  *See also Wilharms v. Wilharms*, 93 Wis. 2d 671, 679, 287 N.W.2d 779, 783 (1980) (to invoke a constructive trust, plaintiff must demonstrate unjust enrichment and some additional factor such as "actual or constructive fraud, duress, abuse of a confidential relationship, mistake, commission of a wrong or some form of unconscionable conduct").

Similarly, Belfor asserts a claim of equitable subordination against Dupaco.  Under that theory, courts may subordinate a party's claim if the party "engaged in inequitable conduct that injured other creditors or conferred an unfair advantage on the claimant." *In re Sentinel Mgmt. Grp, Inc.*, 728 F.3d 660, 669 (7th Cir. 2013).  Belfor's claim of equitable subrogation against the Grimes and Chicago's Best -- in which it asks for an

---

[15] Plaintiff also asserts a claim for tortious interference with contract against Dupaco, but did not move for summary judgment on this claim.  Dupaco, however, addressed this claim in its cross-motion, arguing that it could not have interfered with Belfor's rights because Dupaco itself has a right to the ACV proceeds.  (Dupaco's Br. (dkt. #90) 25-26.) This claim, too, turns on a finding that Dupaco wrongfully applied the ACV proceeds to its mortgage.

order allowing Belfor to stand in the shoes of Dupaco to enforce the mortgage and notes against Chicago's Best and the Grimes -- also is premised on Belfor's assertion that "Chicago's Best and the Grimeses used Belfor's money, *i.e.*, the insurance proceeds to pay off their debt to Dupaco." (Pl.'s Br. (dkt. #34) 11.)[16]

Contrary to Belfor's assertion, the undisputed record demonstrates that the check issued to Chicago's Best, the Grimes and Dupaco represented the actual cash value of the property. Moreover, that check was properly endorsed to Dupaco as the "loss payee" identified in the insurance policy and subject to the terms of the mortgage agreement between Dupaco and the Grimes. While the work authorizations provide Belfor with a right to "all insurance drafts for all insurance work performed by Contractor on the above damaged property," the ACV insurance proceeds check was *not* for insurance work completed by Belfor, but rather represented the cash value of the damaged property. (7/30/14 Linden Aff., Ex. 1 (dkt. #74-1).) Moreover, the work authorizations also provide that "[a]ll insurance work performed by the Contractor is subject to the terms of the insured policy of insurance." (*Id.*) Here, the Auto-Owners Insurance policy identifies *Dupaco* as the loss payee. (Arenz Aff., Ex. 3 (dkt. #92-3) p.4.) While the work authorizations certainly provide Belfor with the right to certain insurance proceeds --

---

[16] Belfor does not explain how the facts asserted here fit within the equitable subrogation remedy, which is available when a person "pays a debt which in equity and good conscience should be satisfied by another." *Rock River Lumber Corp. v. Universal Mortg. Corp.*, 82 Wis. 2d 235, 240, 262 N.W.2d 114 (1977); *see also In re Carley Capital Grp.*, 119 B.R. 646, 649 (W.D. Wis. 1990) (listing elements of such a claim). Regardless, Belfor conceives the claim as one which also rests on it having a right to the ACV insurance proceeds.

debris removal or services directed to rehabilitation -- Belfor has no claim, much less exclusive or even a superior claim, to the ACV insurance proceeds.

Plaintiff also takes issue with the $174,316.47 check issued by Auto-Owners for damage to equipment.  Since this check is being held in a trust account, there is no basis for claiming wrongdoing on Dupaco's part.  Furthermore, it appears that these proceeds were for damage to equipment in which Dupaco holds an interest under its collateral security agreement with Chicago's Best.  Belfor has not demonstrated that the Grimes' failure to turn over these proceeds, or Dupaco's claim to them, constitutes wrongful conduct on any defendant's part.

In a convoluted argument, Belfor also contends that Dupaco applied the ACV insurance proceeds to the Grimes' loan balance, knowing that it "would hinder their ability to access replacement value proceeds."  (Pl.'s PFOFs (dkt. #129) ¶ 32.)  The undisputed record demonstrates that Dupaco asked Auto-Owners if applying the funds would hinder the Grimes' ability to access future insurance disbursements and was assured that it would not.  (Dupaco's Resp. to Pl.'s PFOFs (dkt. #147) ¶ 32.)  On this record, plaintiff has failed to demonstrate that Dupaco acted inequitably in applying the ACV insurance proceeds to the mortgage.[17]

---

[17] By bringing a claim for "equitable subordination" against Dupaco, Belfor may have intended to seek a declaratory judgment of its superior interest in these insurance proceeds and/or inventory, but has not given this court a factual basis to award it.

23

### III.  Claims Concerning Dupaco's Double Recovery

Belfor also argues that an equitable remedy is warranted to address Dupaco's alleged "windfall" in receiving both insurance proceeds for the property loss *and* the benefit of the improved property based on Belfor's services.  While there are fact issues as to whether Belfor's services actually improved the property, Belfor primarily relies on an Eastern District of Michigan Bankruptcy court case in which the court held that the contractor was entitled to insurance proceeds on an unjust enrichment theory.  *See In re Jackson Precision Die Casting, Inc.*, 291 B.R. 396 (Bankr. E.D. Mich. 2003).  The *Jackson* court recognized that under contract rights, the mortgage lender has the prior, superior interest, but was unwilling

> to reach a conclusion on the basis of contract rights.  To do so would mean that LaSalle would be unjustly enriched at the expense of Inrecon.  That is, the work that Inrecon did benefitted LaSalle because it worked toward the restoration of the value of LaSalle's collateral after the fire occurred.  To allow LaSalle to have this benefit and also to collect the insurance proceeds for the benefit would be manifestly unjust.

*Id.* at 399.  Whatever merit there may be to such a claim here, Belfor holds only an arrearage of $2,500 on its first mortgage.  Dupaco represents that it offered to transfer the mortgage to Belfor, which appears to be the only relief warranted under this unjust enrichment theory.  The court will reserve on this claim, and will hear additional argument and evidence if necessary during the course of the trial, outside of the presence of the jury.[18]

---

[18] Unlike the unjust enrichment claim asserted against defendants Chicago's Best and the Grimes, the unjust enrichment claim asserted against Dupaco sounds in equity because

## IV.  Marshaling of Assets Claim against Dupaco

Finally, Belfor also seeks an order requiring Dupaco to marshal its assets by "satisfy[ing] its debts from those outside funds before restoring to the insurance proceeds in which both parties have an interest."  (Pl.'s Br. (dkt. #67) 6.)  "The equitable doctrine of marshaling rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor who may resort to only one of the funds."  *Sowell v. Fed. Reserve Bank of Dallas, Tex.*, 268 U.S. 449, 457 (1925).   For this court to order Dupaco to marshal its assets, Belfor must demonstrate: "(1) [Belfor and Dupaco] are creditors of the same debtor, (2) that there are two funds belonging to that debtor, and (3) that one of them alone has the right to resort to both funds."  *Moser Paper Co. v. N. Shore Pub. Co.*, 83 Wis. 2d 852, 861-62, 266 N.W.2d 411, 416 (1978).  In addition to these elements, Belfor must also demonstrate that marshaling would not impose an undue hardship on or cause prejudice to Dupaco. *United States v. LeMay*, 346 F. Supp. 328, 330 (E.D. Wis. 1972); *In re Brunner*, No. 03-16262-13, 2005 WL 4149015, at *1 (Bankr. W. D. Wis. Dec. 15, 2005).

As became clear during the oral argument, Dupaco has already exhausted three of its sources of funds:  (1) the mortgage on the fire-damaged property; (2) the mortgage on another commercial property; and (3) Randall Grimes' life insurance proceeds.  This leaves three funds available for Dupaco to assert its interest as the senior lien holder:  (1) the $175,000 in the trust account representing the insurance proceeds for damaged

---

the remedy sought -- an order allowing Belfor to step into the shoes of Dupaco in asserting the mortgage -- is equitable in nature.  (*See* discussion *supra*, pp. 19-20.)

equipment; (2) the salvaged equipment held by Belfor; and (3) the mortgage on the Grimes' homestead.  Since Belfor believes it has a legal claim to the first two funds, its remaining request for marshaling of assets boils down to a request that Dupaco foreclose on the Grimes' homestead mortgage before turning to the insurance trust account for damaged equipment or the salvaged equipment itself.

Dupaco raises several challenges to the claim, but the court's analysis begins and ends with Dupaco's argument that the Grimes' homestead deserves protection and should not be subject to this equitable doctrine.  As primarily developed in the bankruptcy context, the homestead exemption, codified at Wis. Stat. § 846.11, protects homestead property in a typical claim for marshaling of assets. *See In re Hartley*, 483 B.R. 700, 706 (Bankr. W.D. Wis. 2012) ("[T]he [homestead] statute essentially renders the doctrine of marshaling of assets unavailable to junior lienholders in those situations where the provision applies.").  Courts have recognized two exceptions where the homestead property owned by shareholders of the debtor corporation can be subject to marshaling:  (1) where "the corporate veil could properly be pierced so as to ignore the ostensibly separate identities of a shareholder and the corporation; and (2) when a shareholder's property should be deemed to be a contribution to the capital of a corporation." *In re Enright*, 474 B.R. 854, 862 (Bankr. E.D. Wis. 2012).  Plaintiff fails to argue, much less submit any evidence, in support of a piercing theory.  As for the second basis, "[p]ledging another party's assets directly to secure a loan to the debtor constitutes a contribution of capital to the debtor, thus satisfying the requirement of the existence of

26

two funds belonging to the debtor." *In re Universal Elec. Sign Co., Inc.*, 255 B.R. 732, 734-35 (Bankr. E.D. Wis. 2000).

In *Moser v. Paper Company v. North Shore Publishing Company*, 83 Wis. 2d 852, 266 N.W.2d 411 (1978), the Wisconsin Supreme Court relied on the latter exception to order marshaling of assets, requiring the senior lien holder to pursue the shareholders' home mortgages rather than other corporate funds.  In that case, the second mortgages placed on the shareholders' homes were "a contribution to the capital stock of the firm," and therefore, the court concluded that by executing the mortgages the shareholders "had placed their residences in the company till." *Id.* at 864, 266 N.W.2d at 417-18.

Here, Belfor has failed to put forth *any* evidence demonstrating that the funds from the Grimes' mortgage on their homestead were funneled to Chicago's Best's "corporate till," rather than used to purchase their residence or for some other reason. Absent evidence demonstrating this link between the homestead mortgage and Chicago's Best, Belfor has failed to overcome the homestead exemption that precludes its marshaling of assets claim against Dupaco.

If the jury finds that the Grimes *are* liable personally under a theory of either breach of contract or unjust enrichment, then marshaling of assets by Dupaco may be warranted.  In that situation, the link between the homestead property and the debtors is direct and undisputed.  But the court need not, and cannot, reach this issue until a determination is made on the Grimes' personal liability.  As such, the court will deny Belfor's motion for summary judgment on its marshaling of assets claim premised on

Chicago's Best as the debtor, but will reserve on a claim premised on the Grimes personally as the debtors.

## V.  Trial Plan

This case will proceed on a bifurcated basis to a jury trial on February 17, 2015 at 9:00 a.m. on two claims:  (1) a breach of contract claim against Chicago's Best and the Grimes; and (2) if the jury finds no contract as to at least one of those defendants, then an unjust enrichment claim against that defendant or defendants.  While the jury is deliberating, the court will also take up plaintiff's unjust enrichment claim asserted against Dupaco based on the double recovery theory.  Finally, the court will reserve on the marshaling of assets claims based on the Grimes as the debtors, pending a determination on the Grimes' personal liability.

## ORDER

IT IS ORDERED that:

1) plaintiff Belfor USA Group's motions for summary judgment (dkt. ##33, 66, 127, 131, 153) are DENIED;

2) defendant Dupaco Community Credit Union, Inc.'s motion for summary judgment (dkt. #89) is DENIED as to plaintiff's unjust enrichment claim premised on the double recovery theory and plaintiff's marshaling of assets claim premised on the Grimes' personal liability, and in all other respects, the motion is GRANTED; and

3) plaintiff's motion to strike affidavits attached to Dupaco's reply in support of its motion for summary judgment (dkt. #116) is GRANTED;

Entered this 16th day of January, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge